SECURITY INSURANCE COMPANY OF HARTFORD
*v*. LUMBERMENS MUTUAL CASUALTY
COMPANY ET AL.
(SC 16716)

Sullivan, C. J., and Norcott, Palmer, Vertefeuille and Zarella, Js.

Argued November 25, 2002—officially released July 22, 2003

*John W. Lemega*, with whom were *Ralph W. Johnson III* and, on the brief, *John B. Farley*, for the appellant (defendant ACMAT Corporation).

*Thomas J. Groark*, with whom was *Mario R. Borelli*, for the appellee (plaintiff).

*C. William Tanzi, Eugene R. Anderson*, pro hac vice, *Mark Garbowski*, pro hac vice, *Brian T. Valery*, law clerk, and *Amy Bach*, pro hac vice, filed a brief for United Policyholders as amicus curiae.

*Andrew J. McDonald, Peter S. Olson, Laura A. Foggan*, pro hac vice, and *John C. Yang*, pro hac vice, filed a brief for the Insurance Environmental Litigation Association as amicus curiae.

*Opinion*

SULLIVAN, C. J. The defendant, ACMAT Corporation (ACMAT),[1] appeals from the trial court's grant of summary judgment on one claim and judgment on a second claim in favor of the plaintiff, Security Insurance Company of Hartford (Security). This appeal involves a dispute over the proper allocation of defense costs in cases involving long latency loss claims that implicate multiple insurance policies. The trial court concluded that the defense costs should be prorated among the insurers with respect to periods covered by their respective policies and the insured with respect to periods for which the insured had lost or destroyed its policies or assumed the obligations of an insurer. Accordingly, the

---

[1] The plaintiff also named Lumbermens Mutual Casualty Company (Lumbermens) as a defendant in count one of its complaint, which is one of the counts at issue in the present case. On January 6, 1997, however, Lumbermens filed a motion for summary judgment, which was granted on May 8, 1998. That ruling has not been challenged here and does not affect the disposition of this appeal.

trial court ordered ACMAT, as the insured, to contribute its pro rata share of the defense costs and to reimburse both party and nonparty insurers for its share of such costs previously expended. We affirm the trial court's ruling that pro rata allocation of defense costs applies in the circumstances of this case, but we reverse its order to ACMAT as it applies to nonparty insurers.

The record reveals the following facts. ACMAT is a Connecticut corporation that was incorporated on March 16, 1951.[2] ACMAT is engaged in the business of construction and renovation and at various times used a fireproofing spray that contained asbestos. On May 1, 1996, more than 100 plaintiffs instituted litigation against ACMAT[3] for bodily injuries allegedly resulting from the inhalation of asbestos (Bridgeport asbestos litigation).[4] See *In re Bridgeport Asbestos Litigation*, Superior Court, judicial district of Fairfield, Docket No. 332364. The plaintiffs in the Bridgeport asbestos litigation did not allege the precise time that the alleged injuries occurred. The parties agree, however, that ACMAT is potentially liable to the Bridgeport asbestos

---

[2] Acoustical Materials Corporation was founded on March 16, 1951. On December 10, 1969, Acoustical Materials Corporation amended its certificate of incorporation to change its name to ACMAT Corporation. This name change was not accompanied by any change in corporate structure.

[3] ACMAT is one of multiple defendants.

[4] The trial court in the present case found that "[t]he model complaint [in the Bridgeport asbestos litigation] alleges that the defendants (including ACMAT), were engaged in the business of buying, selling and installing asbestos products and asbestos materials. The model complaint further alleges that the plaintiffs, while working for their employers at various job sites, came into contact with the asbestos materials and products. Specifically, the model complaint alleges that at all relevant times that the plaintiffs were working, they were 'forced to come in contact with and breathe, inhale and ingest airborne fibers and particles emitted by said [asbestos] products and materials as they were sawed, cut, mixed, installed, removed or otherwise used' by the plaintiffs. The complaint alleges that as a result of this contact with the asbestos, the plaintiffs suffered permanent injuries, diseases and death. Notably absent from any of the model complaint's allegations is a specific date upon which the plaintiffs' alleged injuries occurred."

litigation plaintiffs for bodily injury during the period from March 16, 1951, through May 1, 1996.

During the period for which ACMAT is potentially liable to the Bridgeport asbestos litigation plaintiffs, it purchased several occurrence based comprehensive general liability policies[5] from several different insurance companies. From March 16, 1951, through April 22, 1959, ACMAT had asbestos related insurance coverage, but it either lost or destroyed the insurance policies. ACMAT does not know who the insurers were for this period, and it has made no demand on any insurance carrier for this period to provide it with a defense or to pay any portion of the defense costs in the Bridgeport asbestos litigation. ACMAT alleges that Liberty Mutual Insurance Company (Liberty) provided ACMAT with asbestos related coverage from April 22, 1961, through January 1, 1964. ACMAT, however, has either lost or destroyed the Liberty policies for that period. ACMAT has demanded that Liberty provide it with a defense or pay a portion of the defense costs for the Bridgeport

[5] "Under the occurrence basis [comprehensive general liability], an action seeking damages against the policyholder is covered if it results from an occurrence and causes damage during the policy period. The triggering point . . . is the time of alleged injury, which triggers the [comprehensive general liability] carrier's duty to defend. If the claimant is successful in demonstrating the time of loss alleged, the [comprehensive general liability] insurer on the risk at that time must provide coverage for the damages obtained as well (absent the applicability of an exclusion or the exhaustion of policy limits). Once a [comprehensive general liability] policy is triggered, the insurer remains on the risk even if the injury continues into a subsequent policy period. The key point is the time of precipitating injury. The occurrence (e.g., negligence, defective manufacture) need not take place at the same time as the injury. Consequently . . . occurrence [comprehensive general liability] coverage may obtain today for precipitating events decades old. For example, negligent manufacture may cause harm that does not take place for years. But when it does, the occurrence [comprehensive general liability coverage] on the risk at that time is triggered. Consequently, occurrence [comprehensive general liability policies] are sometimes described as providing almost unlimited 'prospective' coverage." J. Stempel, Law of Insurance Contract Disputes (Sup. 2002) § 14.02, p. 14-9.

asbestos litigation, but Liberty has refused, claiming that it never issued such policies to ACMAT. ACMAT alleges that Greater New York Insurance Company (Greater New York) provided ACMAT with asbestos related coverage from January 1, 1964, through January 1, 1968. ACMAT, however, has either lost or destroyed the Greater New York policies as well. ACMAT has demanded that Greater New York provide it with a defense or pay a portion of the defense costs of the Bridgeport asbestos litigation, but Greater New York refused, claiming that it had never issued such policies to ACMAT.[6] From January 1, 1968, through January 1, 1972, ACMAT was insured by Travelers Insurance Company (Travelers), formerly known as Aetna Casualty and Surety Company; from January 1, 1972, through January 1, 1976, ACMAT was insured by Security; from January 1, 1976, through January 1, 1979, ACMAT was insured by Liberty; from January 1, 1979, through April 15, 1981, ACMAT was insured by Lumbermens Mutual Casualty Company (Lumbermens); and from April 15, 1981, through April 15, 1985, ACMAT was insured by CIGNA Corporation (CIGNA).[7] All of those policies were substantially the same in their coverage of "bodily injuries."[8]

---

[6] We will refer to the time period from March 16, 1951, through January 1, 1968, as the lost policy period.

[7] Since April 1, 1985, ACMAT has been insured pursuant to certain claims-made comprehensive general liability policies that specifically exclude coverage for asbestos related claims.

[8] The only insurance policy in the record before this court is the Lumbermens policy issued in 1980, which provides in relevant part that Lumbermens "will pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of . . . bodily injury . . . to which this insurance applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury . . . even if any of the allegations of the suit are groundless, false or fraudulent, and may make such investigation and settlement of any claim or suit as it deems expedient, but the Company shall not be obligated to pay any claim or judgment or to defend any suit after the applicable limit of the Company's liability has been exhausted by payment of judgments or settlements."

On July 1, 1992, ACMAT and Lumbermens entered into a buy-back agreement and release of policies (buy-back agreement) pursuant to which, in return for $300,000, ACMAT released Lumbermens from its obligations under its insurance policies with ACMAT for the time period between January 1, 1979, through April 15, 1981.[9] Under the buy-back agreement, ACMAT agreed

The policy defines " 'bodily injury' " as "bodily injury, sickness or disease sustained by any person which occurs during the policy period, including death at any time resulting therefrom . . . ."

The policy defines " 'occurrence' " as "an accident, including continuous or repeated exposure to conditions which results in bodily injury . . . neither expected nor intended from the standpoint of the insured . . . ."

The policy also contains an "Other Insurance" clause, which provides that "[t]he insurance afforded by this policy is primary insurance, except when stated to apply in excess of or contingent upon the absence of other insurance. When this insurance is primary and the insured has other insurance which is stated to be applicable to the loss on an excess or contingent basis, the amount of the company's liability under this policy shall not be reduced by the existence of such other insurance.

"When both this insurance and other insurance apply to the loss on the same basis, whether primary, excess or contingent, the company shall not be liable under this policy for a greater proportion of the loss than that stated in the applicable contribution provision . . . ."

The applicable contribution provision provides: "(a) Contribution by Equal Shares. If all of such other valid and collectible insurance provides for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable limit of liability under any one policy or the full amount of the loss is paid, and with respect to any amount of loss not so paid the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

"(b) Contribution by Limits. If any of such other insurance does not provide for contribution by equal shares, the company shall not be liable for a greater proportion of such loss than the applicable limit of liability under this policy for such loss bears to the total applicable limit of liability of all valid and collectible insurance against such loss."

The trial court found that the other comprehensive general liability policies that were triggered by the Bridgeport asbestos litigation are substantially similar in their coverage. This finding is not challenged on appeal.

[9] We will refer to the period of time from January 1, 1979, through April 15, 1981, as the buy-back period.

that "any and all duties and obligations, of any kind or nature whatsoever, past, present, or future, that exist or might be deemed to exist under or in connection with the [Lumbermens] policies, are hereby satisfied, discharged, terminated, and released, and a complete extinguishment and termination of any such coverage under these policies is hereby effected. ACMAT acknowledges that as of the date of this Agreement, ACMAT has no further liability insurance coverage of any kind with [Lumbermens]."

Also included in the buy-back agreement is a section entitled "Indemnification," which provides in relevant part: "If any claimant, insurer or other person or entity, asserts a claim against [Lumbermens] under or in connection with the [Lumbermens] policies arising out of any alleged liability of ACMAT and where [Lumbermens'] obligation, if any, to defend or indemnify ACMAT with respect to such alleged liability has been released or extinguished by the Agreement, ACMAT shall indemnify [Lumbermens] and hold it harmless against any and all loss or liability incurred as a result of or in connection with any such claim. The obligation of ACMAT under this paragraph shall extend to and include any and all losses or expenses incurred by [Lumbermens] in the defense, payment, or handling of such claim, including, without limitation, reasonable legal fees and expenses, judgments, settlements, and the cost of complying with any equitable decrees. . . ."

Four insurers, Travelers, Liberty, CIGNA and Security, have agreed to participate in the defense of the Bridgeport asbestos litigation. On August 26, 1996, Security filed a two count complaint[10] against ACMAT and Lumbermens seeking a declaratory judgment establishing ACMAT's obligation to assume an equitable por-

[10] Count two was withdrawn on March 10, 2000, and is not relevant to this appeal.

tion of the costs of defending the Bridgeport asbestos litigation.[11] In count one, Security alleged that ACMAT or Lumbermens or both should be held responsible for an equitable share of the defense costs attributable to the buy-back period. The trial court granted Lumbermens' motion for summary judgment as to count one. The propriety of this grant of summary judgment is not before us in this appeal. Security filed a cross motion for summary judgment against ACMAT. The trial court denied Security's cross motion for summary judgment, finding that an issue of material fact was in dispute. The trial court denied Security's renewed motion for summary judgment on procedural grounds, finding that Security had not given proper notice to nonparty insurers. Security filed a second renewed motion for summary judgment against ACMAT, and the trial court granted this motion, finding that "ACMAT is legally obligated to . . . assume an equitable share of the costs of defending the Bridgeport [asbestos] litigation as a result of having released Lumbermens from the latter's obligation to defend."

On November 30, 1999, Security filed an amended complaint adding a third count against ACMAT. In the third count, Security sought a declaration that ACMAT was obligated to assume an equitable share of the cost of its defense proportionate to the lost policy period. Following a bench trial, on May 9, 2001, the trial court rendered judgment for Security, finding that "ACMAT is responsible to contribute an equitable share of the costs of defense for years in which no insurer was identified or for which ACMAT lost or destroyed the policies and the alleged insurer has refused coverage." The trial court first determined that the Bridgeport asbestos litigation involved a "continuous trigger situa-

---

[11] All references to "the complaint" in this opinion are to this complaint and not to the complaint of the Bridgeport asbestos litigation plaintiffs against ACMAT.

tion such that all asbestos related injury policies issued during the extended exposure period have been triggered for coverage and all companies that issued such policies are responsible for defense costs related to the Bridgeport asbestos litigation."[12] The court, citing *Stonewall Ins. Co.* v. *Asbestos Claims Management Corp.*, 73 F.3d 1178 (2d Cir. 1995), modified, 85 F.3d 49 (2d Cir. 1996), and *Sacharko* v. *Center Equities Ltd.*

[12] "Historically, the [comprehensive general liability] has been written on an accident or occurrence basis . . . . According to the express language of the occurrence basis [comprehensive general liability], the insurer is obligated to defend claims and pay for covered bodily injury, . . . where the injury is caused by an occurrence and takes place during the policy period.

"Thus, the occurrence-basis policy is geared to paying claims for losses that take place during the policy period and result in a policyholder's legal liability. This means that the time of the negligent acts causing injury (e.g., manufacture of asbestos, failure to warn, dangerous design of a consumer product) is not determinative of the insurer's obligation to defend and pay. Rather, there must be injury from an occurrence during the policy period to trigger occurrence policy coverage. . . ." (Internal quotation marks omitted.) J. Stempel, Law of Insurance Contract Disputes (Sup. 2002) § 14.09[a][1], p. 14-41.

"Courts have responded to the trigger problem in long latency cases involving occurrence-basis [comprehensive general liability] coverage with four definitions of the trigger of coverage:

"(1) *Manifestation*. These courts hold that an injury subject to a claim occurs when it manifests itself or becomes reasonably capable of diagnosis.

"(2) *Exposure*. These courts hold that a policy is triggered when the claimant is exposed to the alleged cause of the disease regardless of when the injury became manifest or capable of diagnosis.

"(3) *Injury-in-fact or actual injury*. These courts hold that the occurrence giving rise to the third-party claim happens at the time when the body's defenses to the cause of the disease have been 'overwhelmed' so that significant injury has become inevitable.

"(4) *Multiple, Continuous, or Successive trigger*. Under this approach, pioneered by the District of Columbia Circuit in the well-known case of *Keene Corporation* v. *Insurance Company of North America*, [667 F.2d 1034 (D.C. Cir. 1981), cert. denied, 455 U.S. 1007, 102 S. Ct. 1644, 71 L. Ed. 2d 875 (1982)] an occurrence has happened whenever the claimant was exposed to the cause of the injury, was injured in fact, or the injury became manifest. Consequently, any of these events trigger the applicable insurance policy in force at the time of the event." (Emphasis in original.) J. Stempel, Law of Insurance Contract Disputes (2d Ed. 1999 & Sup. 2002) § 14.09[b], pp. 14-42 through 14-44.

*Partnership,* 2 Conn. App. 439, 479 A.2d 1219 (1984), went on to conclude that "the pro rata allocation approach has been adopted by Connecticut courts and the Second Circuit, when complicating factors exist, as here." The trial court further found that ACMAT was responsible for paying a pro rata share of its defense costs in the Bridgeport asbestos litigation equal to 50.18 percent based upon its liability under counts one and three.[13]

---

[13] In calculating this percentage, the trial court stated: "The court adopts the method of calculating equitable allocation set forth in *Stonewall Ins. Co.* v. *Asbestos Claims Management,* supra, 73 F.3d 1178 [applying New York law]. The court in *Stonewall [Ins. Co.]* implement[ed] proration-to-the-insured by obliging [the self-insured] to pay a share of each claim represented by a fraction that has as its denominator the number of years of the *injury up to 1985, [the time at which insurance companies ceased providing* asbestos related comprehensive general liability coverage], and as its numerator the number of those years in which [the self-insured] was uninsured . . . ."

"ACMAT's equitable share of the defense costs is represented by a fraction that has as its denominator the number of months during the period March 16, 1951, the date on which ACMAT came into existence, until April 1, 1985, at which time asbestos related injury insurance became unavailable to ACMAT. The denominator, the number of months of ACMAT's existence when asbestos related injury coverage was available, totals 408.5 months.

"The numerator is the total of the number of months for which ACMAT was essentially self-insured by reason of the Lumbermens policy buy-back (the first count) and the loss or destruction of its earlier insurance policies (the third count). These form the bases of ACMAT's equitable obligation to *contribute to the costs of defense.*

"The numerator is calculated as follows: The policies for March 16, 1951, through April 22, 1959, were lost or destroyed . . . a total of ninety-seven months. The policies for April 22, 1961, through January 1, 1964, were lost or destroyed and coverage refused . . . a total of 32.5 months. The policies for January 1, 1964, through January 1, 1968, were lost or destroyed and coverage refused . . . a total of forty-eight months. These total to 177.5 months under the third count for which insurance coverage cannot be established and ACMAT is responsible in equitable contribution, or 43.45 percent of the denominator of 408.5 months.

"In addition, the court has previously held that ACMAT is responsible under the first count in equitable contribution for January 1, 1979, through April 15, 1981, the period for which ACMAT accepted responsibility under the buy-back agreement with Lumbermens. . . . That period is 27.5 months, or 6.73 percent of 408.5 months. In total then ACMAT is responsible in

ACMAT appealed from the trial court's judgment to the Appellate Court and we transferred the case to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. ACMAT claims on appeal that the trial court improperly rendered judgment in favor of Security as to count three, pertaining to the lost policy period, because it failed to apply the joint and several method of allocating defense costs. In support of this claim, ACMAT argues that the pro rata method: (1) improperly treats the duty to defend in the same manner as the more narrow duty to indemnify; (2) improperly recognizes a claim for equitable contribution by an insurer against its insured; and (3) improperly recognizes a claim for reimbursement of defense costs by an insurer against its insured. In the alternative, ACMAT claims that, even if we adopt the pro rata method, it should not apply to the circumstances in this case. ACMAT further claims that the trial court improperly granted Security's second renewed motion for summary judgment as to count one, pertaining to the buy-back period, for the same reasons. Finally, ACMAT claims that the trial court lacked jurisdiction to order ACMAT to reimburse nonparty insurers.

We conclude that the trial court properly applied the pro rata method of apportioning defense costs to the lost policy period. We further conclude that the trial court properly recognized a cause of action for equitable contribution and reimbursement by an insurer against its insured. We also conclude that the trial court properly allocated defense costs to ACMAT on a pro rata basis and ordered contribution and reimbursement to Security for the buy-back period. Finally, we conclude that the trial court lacked jurisdiction to order contribution and reimbursement to nonparty insurers.

equitable contribution toward the costs of defense for 205 months, which is 50.18 percent of 408.5 months." (Citations omitted; internal quotation marks omitted.)

Accordingly, we reverse in part and affirm in part the trial court's judgment.

## I

ACMAT first contends that, in rendering judgment on count three of the complaint pertaining to the lost policy period, the trial court improperly allocated defense costs to ACMAT on a pro rata basis. ACMAT maintains that the joint and several method of allocation, as adopted by the United States Court of Appeals for the District of Columbia Circuit in the seminal case of *Keene Corp.* v. *Ins. Co. of North America*, 667 F.2d 1034 (D.C. Cir. 1981), cert. denied, 455 U.S. 1007, 102 S. Ct. 1644, 71 L. Ed. 2d 875 (1982), applies where multiple insurance policies are triggered owing to the gradual and progressive nature of the injury. ACMAT further contends that the pro rata method of allocating defense costs improperly treats the broad duty to defend like the narrower duty to indemnify. Security contends that the trial court correctly allocated defense costs to ACMAT on a pro rata basis for the lost policy period. We agree with Security and conclude that the pro rata method of allocating defense costs applies in long latency loss claims that implicate multiple insurance policies.

We begin by setting forth the applicable standard of review. "The scope of our appellate review depends upon the proper characterization of the rulings made by the trial court. . . . When . . . the trial court draws conclusions of law, our review is plenary and we must decide whether its conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *Cavanaugh* v. *Newtown Bridle Lands Assn., Inc.*, 261 Conn. 464, 470, 803 A.2d 305 (2002). "[B]ecause the proper construction of a policy of insurance presents a question of law, the trial court's interpretation of the policy

is subject to de novo review on appeal." (Internal quotation marks omitted.) *QSP, Inc.* v. *Aetna Casualty & Surety Co.*, 256 Conn. 343, 352, 773 A.2d 906 (2001).

Asbestos related injury has spawned a vast number of lawsuits across the country seeking to allocate liability for injury, as well as a vast amount of secondary litigation, such as this case, seeking "to determine whether and when asbestos manufacturers or sellers or their insurers must ultimately bear the costs of defending these suits and compensating asbestos victims." *Lac d'Amiante du Quebec, Ltee.* v. *American Home Assurance Co.*, 613 F. Sup. 1549, 1551 (D.N.J. 1985). Two general approaches to the allocation of liability and defense costs in long latency loss claim cases have emerged: the pro rata and the joint and several methods of allocation.[14] Under the pro rata method, the

---

[14] For courts adopting the pro rata approach, see *Stonewall Ins. Co.* v. *Asbestos Claims Management Corp.*, supra, 73 F.3d 1178 (New York law); *Gulf Chemical & Metallurgical Corp.* v. *Associated Metals & Minerals Corp.*, 1 F.3d 365 (5th Cir. 1993) (Texas law); *Commercial Union Ins. Co.* v. *Sepco Corp.*, 918 F.2d 920 (11th Cir. 1990) (Alabama law); *Equal Employment Opportunity Commission.* v. *Southern Publishing Co.*, 894 F.2d 785 (5th Cir. 1990) (Mississippi law); *Budd Co.* v. *Travelers Indemnity Co.*, 820 F.2d 787 (6th Cir. 1987) (Michigan law); *Porter* v. *American Optical Corp.*, 641 F.2d 1128 (5th Cir.), cert. denied sub nom. *Aetna Casualty & Surety Co.* v. *Porter*, 454 U.S. 1109, 102 S. Ct. 686, 70 L. Ed. 2d 650 (1981) (Louisiana law); *Ins. Co. of North America* v. *Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir. 1980), clarified, 657 F.2d 814 (6th Cir.), cert. denied, 454 U.S. 1109, 102 S. Ct. 686, 70 L. Ed. 2d 650 (1981) (Illinois and New Jersey law); *Uniroyal, Inc.* v. *Home Ins. Co.*, 707 F. Sup. 1368 (E.D.N.Y. 1988) (New York law); *Fireman's Fund Ins. Cos.* v. *Ex-Cell-O Corp.*, 685 F. Sup. 621 (E.D. Mich. 1987) (Michigan law); *Sentinel Ins. Co.* v. *First Ins. Co. of Hawaii*, 76 Haw. 277, 875 P.2d 894, motion for reconsideration granted, 76 Haw. 453, 879 P.2d 558 (1994); *United States Gypsum Co.* v. *Admiral Ins. Co.*, 268 Ill. App. 3d 598, 643 N.E.2d 1226 (1994), cert. denied, 161 Ill. 2d 542, 649 N.E.2d 426 (1995); *Northern States Power Co.* v. *Fidelity & Casualty Co. of New York*, 523 N.W.2d 657 (Minn. 1994); *Owens-Illinois, Inc.* v. *United Ins. Co.*, 138 N.J. 437, 650 A.2d 974 (1994).

For courts adopting the joint and several method of allocation, see *New Castle County* v. *Hartford Accident & Indemnity Co.*, 933 F.2d 1162 (3d Cir. 1991) (Delaware law); *ACandS, Inc.* v. *Aetna Casualty & Surety Co.*, 764 F.2d 968 (3d Cir. 1985) (Pennsylvania law); *Keene Corp.* v. *Ins. Co. of*

insured is liable for costs attributable to losses occurring during periods when it was uninsured, while under the joint and several method, all costs are allocated among insurers. We note that "[n]o great difference in principle divides [pro rata and joint and several allocation]. Using either method, allocation will exist among the insurance companies on the risk. . . . The real difference between [the methods] is in their treatment of periods of self-insurance." *Owens-Illinois, Inc.* v. *United Ins. Co.*, 138 N.J. 437, 467, 650 A.2d 974 (1994).

ACMAT urges us to adopt the joint and several method adopted by the United States Court of Appeals for the District of Columbia Circuit in *Keene Corp.* v. *Ins. Co. of North America*, supra, 667 F.2d 1034. In *Keene Corp.*, the insured brought an action for a declaratory judgment seeking to determine the extent to which each insurance policy it had held during the time of potential liability for asbestos related bodily injury claims would cover such liability. Id., 1039. "The [D]istrict [C]ourt held that indemnification and defense costs should be prorated among the insurance companies according to the relative extent of exposure during their respective policy periods. The [D]istrict [C]ourt also held that [the insured was] liable for a pro-rata share of the costs when exposure occurred during a period in which [the insured] was uninsured." Id.

The United States Court of Appeals for the District of Columbia Circuit reversed the judgment of the District Court, holding that the joint and several method of apportioning liability for indemnification and defense costs applied. Id., 1051–52. The court stated that "[t]he

*North America*, supra, 667 F.2d 1034; *Eli Lilly & Co.* v. *Home Ins. Co.*, 653 F. Sup. 1 (D.D.C. 1984) (Indiana law); *Lac d'Amiante du Quebec, Ltee.* v. *American Home Assurance Co.*, supra, 613 F. Sup. 1549 (New Jersey law); *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co.*, 45 Cal. 4th 1, 52 Cal. Rptr. 2d 690 (1996); *J.H. France Refractories Co.* v. *Allstate Ins. Co.*, 534 Pa. 29, 626 A.2d 502 (1993).

first step in the analysis of this problem is to determine what events, from the point of exposure [to asbestos] to the point of manifestation [of bodily injury], trigger coverage under these policies." Id., 1042. The court adopted the continuous trigger theory, stating that "[w]e conclude . . . that inhalation exposure, exposure in residence, and manifestation all trigger coverage under the policies." Id., 1047.

The court then determined the extent of the coverage for which the insurer on each triggered policy was liable. Id. The court concluded, on the basis of the " 'all sums' " language in the policies,[15] that the insurer on each triggered policy was jointly and severally liable up to its policy limits, subject to " 'other insurance' " clauses[16] in the policies, even for periods during which

---

[15] The insurance policies provided that the insurer would pay "on behalf of the *insured* all sums which the *insured* shall become legally obligated to pay as *damages* because of *bodily injury* . . . to which this insurance applies, caused by an *occurrence,* and the company shall have the right and duty to defend any suit against the *insured* seeking *damages* on account of such *bodily injury* . . . even if any of the allegations of the suit are groundless, false or fraudulent . . . ." (Emphasis in original; internal quotation marks omitted.) *Keene Corp.* v. *Ins. Co. of North America,* supra, 667 F.2d 1039. This language is virtually identical to the language of the policies at issue in this case. See footnote 8 of this opinion.

[16] "Historically, other insurance clauses were designed to prevent multiple recoveries when more than one policy provided coverage for a given loss. . . . An example of a typical multiple-coverage case is the situation in which a loss is incurred by an insured driver while driving an automobile of an insured owner with the owner's permission. . . . In such a case both policies clearly cover the entire loss. [T]here are three general types of other insurance clauses—excess, pro rata and escape. Excess insurance kicks in to provide additional coverage once the policy limits of other available insurance are exhausted. Pro rata provisions allocate financial responsibility between concurrent policies based upon the percentage of coverage each policy bears to the net amount of coverage under all applicable policies. An escape clause attempts to release the insurer from all liability to the insured if other coverage is available." (Citations omitted; internal quotation marks omitted.) *Owens-Illinois, Inc.* v. *United Ins. Co.,* supra, 138 N.J. 470.

The court in *Keene Corp.,* however, applied the other insurance clauses to consecutive policies to allocate liability and defense costs among policies triggered under the continuous trigger theory. One court, critical of the *Keene Corp.* court's analysis, points out that "[g]enerally speaking, pro-rata

the insured was uninsured. Id. The court stated that "[o]ur starting point is the interpretation of the policies as the insurers' promises of certainty to [the insured]. The policies that were issued to [the insured] relieved [the insured] of the risk of liability for latent injury of which [the insured] could not be aware when it purchased insurance. [The insured] did not expect, nor should it have expected, that its security was undermined by the existence of prior periods in which it was uninsured, and in which no known or knowable injury occurred. If, however, an insurer were obligated to pay only a pro-rata share of [the insured's] liability [and defense costs], as the [D]istrict [C]ourt held, those reasonable expectations would be violated. [The insured's] security would be contingent on the existence and validity of all the other applicable policies. Each policy, therefore, would fail to serve its function of relieving [the insured] of all risk of liability. The logical consequence of this is that the policies must require that once an insurer's coverage is triggered, the insurer is liable to [the insured] to the full extent of [the insured's] liability up to its policy's limits, but subject to 'other insurance' clauses . . . ." Id., 1047–48.

The court continued, "each policy has a built-in trigger of coverage. Once triggered, each policy covers [the insured's] liability. There is *nothing* in the policies that provides for a reduction of the insurer's liability if an injury occurs only in part during a policy period. As we interpret the policies, they cover [the insured's] entire liability once they are triggered. That interpretation is

---

provisions [in other insurance clauses] are intended to apply only when the coverage is concurrent. . . . If the policies do not overlap, such clauses are not generally applicable." (Citation omitted; internal quotation marks omitted.) Id. This leads to the anomaly that "although [*Keene Corp.*'s] premise is that all damages can be claimed in any one of the years, it nonetheless calls for contribution from other policies. By definition, if all damages occurred in one of the years . . . none of the other policies would be triggered." Id., 462.

based on the terms of the policies themselves. We have no authority upon which to pretend that [the insured] also has a 'self-insurance' policy that is triggered for periods in which no other policy was purchased. Even if we had the authority, what would we pretend that the policy provides? What would its limits be? There are no self-insurance policies, and we respectfully submit that the contracts before us do not support judicial creation of such additional insurance policies." (Emphasis in original.) Id., 1048–49.

The court then determined how liability should be allocated among the triggered policies. The court stated, "[i]n any suit against [the insured] for an asbestos-related disease, it is likely that the coverage of more than one insurer will be triggered. Because each insurer is fully liable, and because [the insured] cannot collect more than it owes in damages, the issue of dividing insurance obligations arises. The only logical resolution of this issue is for [the insured] to be able to collect from any insurer whose coverage is triggered, the full amount of indemnity that it is due, subject only to the provisions in the policies that govern the allocation of liability when more than one policy covers an injury. That is the only way that [the insured] can be assured the security that it purchased with each policy." Id., 1050. The court thus concluded that the insured could choose which triggered policy would defend and indemnify it up to the chosen policy's limits subject only to the insurance contract's " 'other insurance' " clause. Id.

Although the court's analysis focused on the allocation of liability, the court also addressed defense costs. The court stated, "[t]he policies provide that the insurer shall defend any suit against [the insured] for damages due to bodily injury, even if the suit is groundless, false or fraudulent. The insurers' duty to defend [the insured] and to pay [the insured] for its defense costs are more broad than their duty to indemnify [the insured]. As

long as a complaint indicates that [the insured] may be liable for an injury, an insurer must defend [the insured] if the facts alleged in the complaint indicate that its policy covers the alleged injury. Because we hold that each insurer is fully liable to [the insured] for indemnification, it follows that each is fully liable for defense costs." Id.

Security urges us to reject this analysis and to adopt the pro rata method of allocation. The seminal case setting forth the pro rata method of allocating defense costs is *Ins. Co. of North America* v. *Forty-Eight Insulations, Inc.*, 633 F.2d 1212 (6th Cir. 1980), clarified, 657 F.2d 814 (6th Cir.), cert. denied, 454 U.S. 1109, 102 S. Ct. 686, 70 L. Ed. 2d 650 (1981) (*Forty-Eight Insulations, Inc.*).

In *Forty-Eight Insulations, Inc.*, the insurer sought a declaratory judgment to establish, among other things, that the insured was responsible for paying a portion of its defense costs and liability for an asbestos action brought against it because it had been "self-insured" for a period of time prior to 1955. Id., 1213, 1215. The insured claimed that it had been insured prior to 1955 but had either lost or destroyed the policies. Id., 1215 n.4. The District Court "treated [the insured] as self-insured and responsible for a pro rata share of the cost of indemnification. . . . The [D]istrict [C]ourt applied an identical rule apportioning the costs of defending the underlying suits. To the extent that the [insured] was uninsured, it [had] to bear its pro-rata share of the costs of defense." Id., 1224.

On appeal, the insured disputed the apportionment of defense costs to it on a pro rata basis, arguing that "the insurer's obligation to defend is very broad— broader than its obligation to indemnify. Under the very wording of the insurance policies, the insurance companies had a duty to defend based on the allegations in

the complaint, even if the allegations are groundless, false, or fraudulent . . . . [The insured argued] further that the duty to defend is sufficiently broad so that it arises when one count of the complaint is within policy coverage and other counts are not. In many such cases, courts have not permitted apportionment of defense costs between the insurer and the insured. From these cases, [the insured] argue[d] that so long as any insurance company had a duty to defend, it ([the insured]) should not be liable for any costs of defense, even if part or most of the underlying lawsuit concerned periods of time when [the insured] was uninsured." (Citation omitted.) Id.

The United States Court of Appeals for the Sixth Circuit rejected this argument, reasoning that "[a]n insurer must bear the entire cost of defense when there is no reasonable means of prorating the costs of defense between the covered and the not-covered items. . . . Thus, in the typical situation, suit will be brought as the result of a single accident, but only some of the damages sought will be covered under the insurance policy. In such cases, apportioning defense costs between the insured claim and the uninsured claim is very difficult. As a result, courts impose the full cost of defense on the insurer.

"These considerations do not apply where defense costs can be readily apportioned. The duty to defend arises solely under contract. An insurer contracts to pay the entire cost of defending a claim which has arisen within the policy period. The insurer has not contracted to pay defense costs for occurrences which took place outside the policy period. Where the distinction can be readily made, the insured must pay its fair share for the defense of the non-covered risk." (Citation omitted; internal quotation marks omitted.) Id., 1224–25. The court adopted the exposure trigger of coverage; id., 1217–23; see also footnote 12 of this opinion; and

thus concluded that the periods of exposure establish that "a reasonable means of proration is available. [The insured] has urged that indemnity costs can be allocated by the number of years that a worker inhaled asbestos fibers. By embracing the exposure theory, we have agreed. There is no reason why this same theory should not apply to defense costs." Id., 1225.

Further, the court reasoned that "[i]t is reasonable to treat [the insured] as an insurer for those periods of time that it had no insurance coverage. Were we to adopt [the insured's] position on defense costs [an insured] which had insurance coverage for only one year out of 20 would be entitled to a complete defense of all asbestos actions the same as a manufacturer which had coverage for 20 years out of 20. Neither logic nor precedent support such a result." Id.

The pro rata method of apportioning defense costs was also adopted by the Supreme Court of New Jersey in *Owens-Illinois, Inc.* v. *United Ins. Co.*, supra, 138 N.J. 437. *Owens-Illinois, Inc.*, was a declaratory judgment action brought by the insured party to establish that its two major insurance carriers were obligated to provide coverage for asbestos related personal injury actions brought against it. Id., 445. The Chancery Division of the New Jersey Superior Court had ruled that all insurers whose policies were triggered were jointly and severally liable to the insured to the extent of their policy limits. Id. The New Jersey Supreme Court reversed that judgment. Id., 479–80. The court first adopted a continuous trigger approach; id., 478; and then conducted an extensive review of both the joint and several and pro rata methods of allocation. Id., 459–67. The court concluded that "[b]ecause multiple policies of insurance are triggered under the continuous-trigger theory, it becomes necessary to determine the extent to which each triggered policy shall provide indemnity. . . . A fair method of allocation appears to

be one that is related to both the time on the risk and the degree of risk assumed. When periods of no insurance reflect a decision by an actor to assume or retain a risk, as opposed to periods when coverage for a risk is not available, to expect the risk-bearer to share in the allocation is reasonable." Id., 479.

The court rejected the joint and several method of allocation as set forth in *Keene Corp.* and instead adopted the holding of *Forty-Eight Insulations, Inc.*, stating that "[n]o great difference in principle divides *Keene [Corp.]* and *Forty-Eight Insulations [Inc.]* Using either method, allocation will exist among the insurance companies on the risk. . . . The real difference between *Keene [Corp.]* and *Forty-Eight Insulations [Inc.]* is in their treatment of periods of self-insurance." Id., 467. The court concluded that neither the language of the policies at issue, the drafting history of comprehensive general liability policies, nor standard principles of insurance contract interpretation provided the answer to the question of which allocation method should be applied. Id., 468–71. Accordingly, the court relied on public policy, concluding that "[t]he theory of insurance is that of transferring risks. Insurance companies accept risks from manufacturers and either retain the risks or spread the risks through reinsurance. . . . Because insurance companies can spread costs throughout an industry and thus achieve cost efficiency, the law should, at a minimum, not provide disincentives to parties to acquire insurance when available to cover their risks. Spreading the risk is conceptually more efficient." (Citation omitted.) Id., 472–73. The court concluded, in effect, that the joint and several liability approach provided a disincentive to insureds to obtain uninterrupted insurance coverage and would result in a windfall to those companies that had broken chains of insurance. Id.

We are persuaded by the reasoning of the courts in *Forty-Eight Insulations, Inc.*, and *Owens-Illinois, Inc.*, and, accordingly, adopt the pro rata approach to the allocation of defense costs in long latency loss claims that implicate multiple insurance policies. First, for all of the reasons set forth by the courts in both *Forty-Eight Insulations, Inc.*, and *Owens-Illinois, Inc.*, we conclude that applying the pro rata method of allocation does not violate the reasonable expectations of the parties to the insurance contracts. Neither the insurers nor the insured could reasonably have expected that the insurers would be liable for losses occurring in periods outside of their respective policy coverage periods.

Additionally, we do not agree with those courts concluding that the insurance contract language at issue in this case is so ambiguous as to how to allocate defense costs in long latency loss claims that it will bear the interpretation that the insurers should be liable for injuries that do not occur during the policy period and, consequently, that they should be liable for defense costs relating to such injuries. Rather, as the court in *Owens-Illinois, Inc.* v. *United Ins. Co.*, supra, 138 N.J. 465–66, noted, "to convert the 'all sums' . . . language into the answer to apportionment when injury occurs over a period of years is like trying to place one's hat on a rack that was never designed to hold it. It does not work. The language was never intended to cover apportionment when continuous injury occurs over multiple years. In addition, the argument that all sums to be assessed because of long-term exposure to asbestos could have been established in any one of the policy years is intuitively suspect and inconsistent with [the] developing jurisprudence in the field of toxic torts."

Although we are bound to construe ambiguities in favor of the insured; see *Travelers Ins. Co.* v. *Namerow*, 261 Conn. 784, 796, 807 A.2d 467 (2002); we cannot

torture the insurance policy language in order to provide ACMAT with uninterrupted insurance coverage where there was none. As numerous courts have noted, "[w]ere we to adopt [the insured's] position on defense costs [an insured] which had insurance coverage for only one year out of 20 would be entitled to a complete defense of all asbestos actions the same as [an insured] which had coverage for 20 years out of 20. Neither logic nor precedent support such a result." *Ins. Co. of North America* v. *Forty-Eight Insulations, Inc.*, supra, 633 F.2d 1225; *Owens-Illinois, Inc.* v. *United Ins. Co.*, supra, 138 N.J. 473.

For all of these reasons, we find the reasoning relied on in the cases adopting the pro rata method of allocation more persuasive than that relied on in the cases adopting the joint and several method of allocation. ACMAT makes the following four arguments in support of joint and several allocation in the present case, however: (1) the pro rata method improperly treats the broad duty to defend as the narrower duty to indemnify; (2) the pro rata method improperly recognizes a cause of action for equitable contribution by an insurer against its insured; (3) the pro rata method improperly recognizes a cause of action for reimbursement by and insurer against its insured; and (4) even if we were to adopt the pro rata method, we should not apply it to the circumstances in this case. We address these arguments in turn.

A

We first address ACMAT's claim that pro rata allocation of defense costs improperly treats the broad duty to defend like the narrower duty to indemnify. ACMAT points out that "[a]n insurer's duty to defend, being much broader in scope and application than its duty to indemnify, is determined by reference to the allegations contained in the [underlying] complaint. . . . The obli-

gation of the insurer to defend does not depend on whether the injured party will successfully maintain a cause of action against the insured but on whether he has, in his complaint, stated facts which bring the injury within the coverage. If the latter situation prevails, the policy requires the insurer to defend, irrespective of the insured's ultimate liability. . . . It necessarily follows that the insurer's duty to defend is measured by the allegations of the complaint. . . . Hence, if the complaint sets forth a cause of action within the coverage of the policy, the insurer must defend." (Internal quotation marks omitted.) *Board of Education* v. *St. Paul Fire & Marine Ins. Co.*, 261 Conn. 37, 40–41, 801 A.2d 752 (2002). ACMAT also notes that "[i]f an allegation of the complaint falls even possibly within the coverage, then the insurance company must defend the insured." (Internal quotation marks omitted.) *Moore* v. *Continental Casualty Co.*, 252 Conn. 405, 409, 746 A.2d 1252 (2000).

We are not persuaded. First, we note that we have previously recognized that "if the complaint alleges a liability which the policy does not cover, the insurer is not required to defend." (Internal quotation marks omitted.) *QSP, Inc.* v. *Aetna Casualty & Surety Co.*, supra, 256 Conn. 354. We have concluded in this case that the insured's policies do not cover liabilities that reasonably can be apportioned to periods outside of each respective policy period. Accordingly, we agree with the rationale set forth by the court in *Forty-Eight Insulations, Inc.*, when it rejected the insured's claim that pro rata allocation violates the duty to defend. That court concluded that "[a]n insurer must bear the entire cost of defense when there is no reasonable means of prorating the costs of defense between the covered and the not-covered items. . . . Thus, in the typical situation, suit will be brought as the result of a single accident, but only some of the damages sought will be

covered under the insurance policy. In such cases, apportioning defense costs between the insured claim and the uninsured claim is very difficult. As a result, courts impose the full cost of defense on the insurer.

"These considerations do not apply where defense costs can be readily apportioned. The duty to defend arises solely under contract. An insurer contracts to pay the entire cost of defending a claim which has arisen within the policy period. The insurer has not contracted to pay defense costs for occurrences which took place outside the policy period. Where the distinction can be readily made, the insured must pay its fair share for the defense of the non-covered risk." (Citation omitted; internal quotation marks omitted.) *Ins. Co. of North America* v. *Forty-Eight Insulations, Inc.*, supra, 633 F.2d 1224–25.

We conclude that, in long latency loss claims that implicate multiple insurance policies, there is a reasonable means of prorating the costs of defense, i.e., time on the risk. Accordingly, we conclude that, because the duty to defend arises solely under contract and because the insurance companies have not contracted to defend the insured for periods outside of the policy period, requiring the insured to pay its fair share of the defense costs in a long latency loss suit that implicates multiple insurance policies does not treat the broad duty to defend as the more narrow duty to indemnify.

### B

Nor are we persuaded by ACMAT's claim that, because there is no claim for equitable contribution by an insurer against its insured, pro rata allocation is improper. In ruling on count three of the complaint, the trial court reasoned that "[t]he doctrine of equitable contribution guides the court in allocating the defense costs among the potentially responsible parties." The trial court further found that "[t]he general rule [in

Connecticut] that all insurers providing primary coverage to an insured are duty bound to defend the insured and will be required to contribute their pro rata share of the cost of defense" is derived from the doctrine of equitable contribution. The court continued, "[a]ccordingly, the court will apply the doctrine of equitable contribution to allocate responsibility for defense costs in the Bridgeport asbestos litigation."

"Contribution is a payment made by each, or by any, of several having a *common interest or liability* of his share in the loss suffered, or in the money necessarily paid by one of the parties in behalf of the others. . . . The right of action for contribution, which is equitable in origin, arises when, as between multiple parties *jointly bound* to pay a sum of money, one party is compelled to pay the entire sum. That party may then assert a right of contribution against the others for their proportionate share of the *common* obligation." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Crotta* v. *Home Depot, Inc.*, 249 Conn. 634, 639–40, 732 A.2d 767 (1999). "Where more than one insurer has issued policies covering the same risk, a court of equity will exercise jurisdiction over the entire controversy to resolve the rights of all the interested parties, particularly where the issues between the insurers and the insured are similar. See 1 John Norton Pomeroy, A Treatise on Equity Jurisprudence § 261s (5th ed. 1941)." *Maryland Casualty Co.* v. *W.R. Grace & Co.*, 218 F.3d 204, 211 (2d Cir. 2000).

In support of its claim that there is no action for equitable contribution by an insurer against its insured, ACMAT points to several California cases. See *Aerojet-General Corp.* v. *Transport Indemnity Co.*, 17 Cal. 4th 38, 72, 948 P.2d 909, 70 Cal. Rptr. 2d 118 (1997), modified sub nom. *Aerojet-General Corp.* v. *American Excess Ins. Co.*, 97 Cal. App. 4th 387, 117 Cal. Rptr. 2d 427 (2002) ("Although insurers may be required to make an

equitable contribution to defense costs *among themselves*, that is all: An insured is not required to make such a contribution *together with insurers.* . . . Equitable contribution applies *only* between insurers . . . and *only* in the absence of contract . . . . It therefore has no place between insurer and insured, which have contracted the one with the other. Neither does it have any place between an insurer and an uninsured or 'self-insured' party." [Citations omitted; emphasis in original.]); *County of San Bernardino* v. *Pacific Indemnity Co.*, 56 Cal. App. 4th 666, 690–91, 65 Cal. Rptr. 2d 657 (1997) ("[a]n insurer may not seek contribution from a self-insured entity because the obligations arising from a policy of insurance do not extend to a self-insurer" [internal quotation marks omitted]); *Armstrong World Industries, Inc.* v. *Aetna Casualty & Surety Co.*, 45 Cal. App. 4th 1, 56–57, 52 Cal. Rptr. 2d 690 (1996) (adopting joint and several apportionment between insurers and "relieving the policyholders from any responsibility to share in the loss for periods of no insurance").

The courts rejecting a cause of action against an insured for equitable contribution have, however, adopted the joint and several method of allocation and, therefore, we find the reasoning in these cases unpersuasive. Those courts that have adopted the pro rata method of allocating defense costs have concluded that there is properly a cause of action for equitable contribution by an insurer against its insured. See *NL Industries, Inc.* v. *Commercial Union Ins. Co.*, 935 F. Sup. 513, 521 (D.N.J. 1996) (compiling cases that have recognized cause of action for equitable contribution by insurer against its insured). As one court has stated: "Although this Court appreciates the argument . . . concerning the indivisible nature of the duty to defend, the Court does not believe that that indivisibility applies to periods of self-insurance. A rule to the contrary

would simply be inequitable." Id. That court went on to reason that, without the pro rata method of allocation, "the insurer would have to defend the action in its entirety, and would not later be able to obtain contribution for defense costs from the insured. For this reason, other courts construing the laws of different jurisdictions have held that contribution from the insured, in this context, [namely, where pro rata allocation is properly applied] may be had." Id.

Thus, the applicability of the doctrine of equitable contribution necessarily follows from the rationale underlying the pro rata method of allocation, i.e., that the duty to defend does not extend to periods of self-insurance. We have concluded that that rationale is persuasive. Accordingly, we conclude that the trial court properly ordered ACMAT to contribute its pro rata share of the cost of defending the Bridgeport asbestos litigation to Security based on the lost policy period.

C

ACMAT next claims that, because there is no cause of action for reimbursement of defense costs by an insurer against its insured, the pro rata method of allocation is improper. We conclude that, where the pro rata method of allocating defense costs applies, it is proper for the trial court to order the insured to reimburse its insurer for defense costs for periods of self-insurance.

An insurer that has provided a defense of a mixed action "may seek reimbursement of the defense costs expended on uncovered claims . . . ." J. Stempel, Law of Insurance Contract Disputes (2d Ed. 1999) § 9.03[c], p. 9-67. The California Supreme Court has held that there is no cause of action for reimbursement by an insurer against its insured for those claims that are at least potentially covered by the policy. *Buss* v. *Superior Court*, 16 Cal. 4th 35, 49–50, 939 P.2d 766, 65 Cal. Rptr.

2d 366 (1997). That court has further stated, however, that "[a]s to the claims that are not even potentially covered, however, the insurer may indeed seek reimbursement for defense costs. . . . The reason is this. Under the policy, the insurer does not have a duty to defend the insured as to the claims that are not even potentially covered. With regard to defense costs for these claims, the insurer has not been paid premiums by the insured. It did not bargain to bear these costs. To attempt to shift them would not upset the arrangement [between the insurer and the insured]. . . . The insurer therefore has a right of reimbursement that is implied in law as quasi-contractual, whether or not it has one that is implied in fact in the policy as contractual. As stated, under the law of restitution such a right runs against the person who benefits from 'unjust enrichment' and in favor of the person who suffers loss thereby. The 'enrichment' of the insured by the insurer through the insurer's bearing of unbargained-for defense costs is inconsistent with the insurer's freedom under the policy and therefore must be deemed 'unjust.' It is like the case of A and B. A has a contractual duty to pay B $50. He has only a $100 bill. He may be held to have a prophylactic duty to tender the note. But he surely has a right, implied in law if not in fact, to get back $50. Even if the policy's language were unclear, the hypothetical insured could not have an objectively reasonable expectation that it was entitled to what would in fact be a windfall." (Citations omitted.) Id., 50–51.

A cause of action for reimbursement is cognizable to the extent required to ensure that the insured not reap a benefit for which it has not paid and thus be unjustly enriched. Where the insurer defends the insured against an action that includes claims not even potentially covered by the insurance policy, a court will order reimbursement for the cost of defending the

uncovered claims in order to prevent the insured from receiving a windfall. Consistent with the pro rata method of allocation, we have concluded that time on the risk is a reasonable means of prorating defense costs for periods of self-insurance. Those costs allocable to periods of self-insurance are not even potentially covered by the insurer's policies. The insured has not paid premiums to the insurer for the cost of defending periods of self-insurance, and the insurer has not bargained to bear these costs. Thus, the insured would be unjustly enriched were we to conclude that there is no claim for reimbursement for the cost expended by the insurers in defending periods of self-insurance. Accordingly, we conclude that, where the pro rata method of apportionment applies, there is a cause of action for reimbursement by an insurer against its insured. We further conclude that the trial court properly ordered ACMAT to reimburse Security for its pro rata share of the cost of defending the Bridgeport asbestos litigation based on the lost policy period.

## D

Finally, ACMAT contends that even if we adopt the pro rata method of allocating defense costs, it should not apply in the present case. ACMAT maintains that the pro rata method applies only in situations where the insured has chosen to forgo insurance and, because it did not *choose* to forgo insurance, but lost or otherwise destroyed the policies from the lost policy period, the pro rata method of allocating defense costs should not apply. We disagree.

In *Forty-Eight Insulations, Inc.*, the seminal case adopting the pro rata method of allocation, the court treated the insured, which had lost or otherwise destroyed its policies, as self-insured even though the insured alleged that it had purchased insurance for that period of time. *Ins. Co. of North America* v. *Forty-Eight*

*Insulations, Inc.*, supra, 633 F.2d 1215 n.4. Similarly, the court in *United States Fidelity & Guaranty Co.* v. *Treadwell Corp.*, 58 F. Sup. 2d 77, 83 n.4 (S.D.N.Y. 1999), concluded that there was no distinction between an insured that has chosen to forgo insurance for a certain period of time and an insured that cannot identify its claimed insurers from a certain period of time.

Although the present case presents a slightly different situation because, unlike the insured in either *Forty-Eight Insulations, Inc.*, or *Treadwell Corp.*, ACMAT has identified two insurance companies that it alleges provided it coverage during the lost policy period, we conclude that this is a distinction without a difference. We have concluded that the pro rata method of allocation is equitable under the circumstances of this case not only because ACMAT, in effect, *chose* to forgo insurance, but also because Security never contracted to pay for defense costs arising outside of its policy period. We decline to impose liability on Security for those defense costs that arise outside of the policy period because to do so would result in a windfall to ACMAT. In the present case, it is irrelevant whether ACMAT can identify the insurers that it claims issued policies to it during the lost policy period. Those insurers have refused coverage, and to impose the cost of defense upon Security for periods outside of its policy period, periods for which it has received no premium from ACMAT, would unjustly enrich ACMAT.

Moreover, we conclude that the trial court properly concluded that, "ACMAT is the party which could have prevented the loss or destruction of the policies. ACMAT through its own actions or inactions . . . has put itself in the position of being, in essence, uninsured for a substantial period of time." The trial court further concluded that "ACMAT is in the best position to pursue claims against any insurance companies it believes issued coverage for the disputed years. ACMAT has the

standing to initiate such a suit and has the best access to the information that would be necessary to prove a claim against such a company." Moreover, the trial court concluded that "Security and its fellow participating insurers bear no blame for the loss of ACMAT's insurance policies. They are not as well situated as ACMAT to pursue claims against insurers that deny coverage or to pursue bills of discovery against suspected insurers of ACMAT. It would be grossly inequitable to make them bear the financial loss of ACMAT's actions or inactions that have rendered ACMAT essentially uninsured for a period when asbestos related injury insurance coverage was available." We conclude that the equitable principles underlying the pro rata method of allocating defense costs support treating ACMAT as uninsured for the lost policy period. Accordingly, we conclude that the trial court properly applied the pro rata method of allocating defense costs in the present case.[17]

For all of the foregoing reasons, we conclude that, in long latency loss claims that implicate multiple insurance policies, the pro rata method of allocating defense costs applies for purposes of allocating costs to the insured for periods during which it was uninsured or has "lost or destroyed its policies"[18] and, therefore, affirm the trial court's judgment on count three of the complaint.

II

ACMAT next contends that, even if the pro rata method properly applies to the lost policy period, the

[17] ACMAT stated in a footnote in its reply brief to this court that, if this court were to adopt the pro rata method of allocation, it would not necessarily have to adopt the method of calculating allocation used by the trial court but, instead, could allocate defense costs equally among the insurers and ACMAT. We find the trial court's method of allocation to be reasonable, however, and ACMAT has provided no compelling reason to adopt any other method.

[18] We do not decide in this case how costs should be allocated if there is uninterrupted coverage.

trial court improperly granted summary judgment on Security's claim seeking allocation of defense costs to ACMAT on a pro rata basis based on the buy-back agreement with Lumbermens. We disagree. The rationale underlying the pro rata method of allocation applies with even greater force to the buy-back period. The buy-back period presents not a period of time for which ACMAT failed to obtain insurance, but rather a period for which it contractually assumed the liability of its insurer in exchange for $300,000. ACMAT's claim that Security has a duty to defend it for that period is thus even more unpersuasive than for the lost policy period. Accordingly, we conclude that the trial court properly applied the pro rata method of allocating defense costs to the buy-back period and affirm the trial court's grant of summary judgment on count one of the complaint.

### III

Finally, ACMAT argues that the trial court had no jurisdiction either to reimburse nonparty insurers or to require ACMAT prospectively to pay those insurers a pro rata share of its defense costs. Security contends that this issue is not before the court in allocating costs on a pro rata basis because the trial court inevitably had to calculate the percentage that was ACMAT's responsibility and the percentage that was Security's responsibility. Security further contends that ACMAT may have a defense on these grounds if one of the nonparty insurance companies attempts to enforce the judgment, but this is not a defense to Security's entitlement to a declaration. We conclude that the trial court lacked jurisdiction to order ACMAT to contribute defense costs to nonparty insurers or to reimburse nonparty insurers and, accordingly, we reverse that portion of the court's order.

"The jurisdiction of the trial court is limited to those parties expressly named in the action coming before

it. . . . Until one is given notice of the actions or proceedings against him and is thereby given opportunity to appear and be heard, the court has no jurisdiction to proceed to judgment either for or against him even though it may have jurisdiction of the subject matter. One who is not served with process does not have the status of a party to the proceeding. . . . A court has no jurisdiction over persons who have not been made parties to the action before it. . . . [Parties] are not fungible, even if they are represented by the same attorney and have similar interests. The general rule is that one party has no standing to raise another's rights." (Citations omitted; internal quotation marks omitted.) *Exley* v. *Connecticut Yankee Greyhound Racing, Inc.*, 59 Conn. App. 224, 234–35, 755 A.2d 990, cert. denied, 254 Conn. 939, 761 A.2d 760 (2000).

In the present case, the trial court ordered ACMAT to reimburse insurers participating in the defense of the Bridgeport asbestos litigation for 50.18[19] percent of the cost of defending that action to date and to join all of the participating insurers in assuming its equitable share, being 50.18 percent, of all past, present and future defense costs. The trial court did not limit itself to ordering reimbursement and contribution in favor of Security, but rather ordered reimbursement and contribution for all insurers, some of which are not parties to the present action. We conclude that the trial court did not have jurisdiction to award payment to nonparty insurers and, accordingly, reverse that portion of the trial court's order.

The judgment is affirmed in part; the judgment is reversed to the extent that it ordered ACMAT to reimburse insurers that were not parties to the action here

[19] The proportion of 50.18 percent was determined by the trial court to be ACMAT's pro rata share of the cost of defense proportionate to both the lost policy period and the buy-back period. See footnote 13 of this opinion.

for a pro rata share of the costs of defending the Bridgeport asbestos litigation and the case is remanded with direction that the judgment be modified accordingly.

In this opinion the other justices concurred.