**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 13-4278
_____


In Re: DDMG ESTATE, et al.,

Debtors

Walt Disney Studios Motion Picture Production,
Briar Rose Production, Ltd.,
and Extinction Productions, Ltd.,

Appellants

_____


On Appeal from the United States District Court
for the District of Delaware
(D. C. No. 1-13-cv-00007)
District Judge:  Honorable Sue L. Robinson


_____


Argued on September 9, 2014

Before:  SMITH, SHWARTZ and ROTH, <u>Circuit Judges</u>

(Opinion filed: February 5, 2015)


Lisa H. Fenning, Esquire (**Argued**)
Arnold & Porter
777 South Figueroa Street
44th Floor
Los Angeles, CA 90017

      Counsel for Appellants

Paige H. Forster, Esquire (**Argued**)
Eric A. Schaffer, Esquire
Reed Smith
225 Fifth Avenue
Suite 1200
Pittsburgh, PA 15222

Counsel for Appellee

O P I N I O N*

**ROTH**, Circuit Judge:

Walt Disney Studios Motion Picture Production[1] appeals the order of the District Court, which affirmed a Bankruptcy Court decision overruling Disney's objections to the sale of six patents pursuant to Sections 363(b) and 365 of Chapter 11 of the Bankruptcy Code. *In re DDMG Estate*, No. 12-12568 (Doc. No. 658) (Bankr. D. Del. Dec. 10, 2012). Because we agree that the sale was not subject to a broad license to the patents beyond the *G-Force* film, we will affirm.[2]

---

* This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.
[1] Appellants include Walt Disney and several affiliates (collectively, Disney), and appellees include debtor Digital Domain Media Group (DDMG) with other affiliated entities and RealD Inc. (collectively, Appellees).
[2] Judge Smith concurs *dubitante*.

2

## I. Background

On April 18, 2008, Disney and In Three, Inc. agreed that In Three would perform 3D conversion services for the film *G-Force* (the *G-Force* Agreement).[3] In 2010, well after the production and release of *G-Force*, In Three sold all of its assets, including the 3D patents used in *G-Force*, to DDMG. It is undisputed that DDMG did not assume or take by assignment the *G-Force* Agreement when it acquired the In Three patents. In September 2012, DDMG filed for Chapter 11 bankruptcy and sought approval of the sale of all of its assets, including the 3D patents, to RealD Inc. Disney objected, asserting a continuing interest in the 3D patents. Disney argued that, pursuant to Sections 16(a) and 16(b) of the *G-Force* Agreement, the holder of the 3D patents could not sue Disney for infringement by vendors "engaged in 'work' for Disney," even if the work was not for the film *G-Force*.

> Section 16(a), captioned "Covenant Not to Sue" provides that In Three:
>
> will not pursue any claim or cause of action or otherwise assert any Company IP[4] . . . against [Disney], its Affiliates or any of their respective customers, agents and distributors . . . based on work for any of the Producer Parties by a third party vendor. Such agreement does not restrict [In Three's] right to pursue a claim or cause of action against a third party for services performed by such third party for the Producer Parties;

---

[3] The *G-Force* Agreement, titled "G-FORCE/Conversion Work," sets forth the terms "with respect to [In Three's] services for the theatrical motion picture tentatively entitled 'G-Force.'" It refers to Acceleration Productions, Inc., which for our purposes is Disney, as the "Producer" and refers to In Three as the "Company."

[4] Section 16(c) of the *G-Force* Agreement defines "Company IP" as "patents and patent applications owned, controlled, or acquired by [In Three] or its Affiliates as of the effective date of this Agreement or at any time in the future that relate to or are otherwise associated with the creation, capture, development, distribution, editing, production or display of a motion picture, television show, animation, or other entertainment image or depiction of any kind of nature, in any form of medium."

3

provided, however, [In Three] and its Affiliates agree that they will not pursue any claim or cause of action or otherwise assert any Company IP against such third party entity which might interrupt such third party entity's services to or on behalf of the Producer Parties.

Section 16(b) granted Disney the option of acquiring a broader license to the 3D patents and technology:

[Disney] may, in its sole discretion, request from [In Three] a license under the Company IP. Within thirty (30) days of receiving such request, [In Three] shall grant to such entity a non-exclusive, transferable (but only to an Affiliate), non-sublicensable, irrevocable, perpetual, worldwide license to make, have made, use, sell, offer for sale, and import any product and perform any method under the Company IP at a fee to be negotiated by the parties in good faith in accordance with then-current industry standards, provided that such fee shall not exceed the lowest license fee provided by Company to any third party.... [I]n the event that [In Three] seeks to sell, assign or otherwise transfer any of the Company IP, or its interest in any of the Company IP, to a third party, [In Three] shall provide prompt written notice to [Disney] not less than sixty (60) days prior to the completion of such sale, assignment, or transfer, and [Disney] or its Affiliates may thereafter obtain a license under the same terms set forth herein.

On December 10, 2012, the Bankruptcy Court overruled Disney's objections. The Bankruptcy Court determined that Disney did not hold a broad license to the patents under either subsection. Specifically, the Bankruptcy Court found that the covenant not to sue in Section 16(a) does not grant Disney a perpetual license to the patents, and Disney never exercised the option to acquire broad rights to the patents in Section 16(b). Disney moved for reconsideration and requested that the Bankruptcy Court hold that "the Section 16(a) [covenant not to sue] [r]ights are *not* limited to the *G-Force* film, but rather to any 'work' being done for [Disney]." After a hearing, the Bankruptcy Court approved the sale and entered the Patent Sale Order on December 21, 2012. The U.S. District

4

Court for the District of Delaware affirmed for the same reasons as the Bankruptcy Court. Disney now appeals.

## II. Standard of Review[5]

"We exercise plenary review over the District Court's appellate review of the Bankruptcy Court's decision and exercise the same standard of review as the District Court in reviewing the Bankruptcy Court's determinations." *In re Miller*, 730 F.3d 198, 203 (3d Cir. 2013) (internal quotation marks and citation omitted). "[W]e review a bankruptcy court's legal determinations de novo, its factual findings for clear error, and its exercises of discretion for abuse thereof." *Id.* (alteration in original) (internal quotation marks and citations omitted).

## III. Discussion

The sole issue on appeal is the scope of the covenant not to sue in Section 16(a) of the *G-Force* Agreement.[6] Disney argues that the covenant created a general license to use the 3D patents that extended to all films, not just *G-Force*. Disney contends that (1) as a matter of patent law, any sale of the patents should have been held subject to the Section 16(a) covenant not to sue because covenants not to sue for infringement are enforceable as patent licenses; and (2) the debtor's rights in the patents are limited by prior licenses and covenants not to sue. DDMG and RealD counter that (1) the covenant

---

[5] The U.S. Bankruptcy Court for the District of Delaware had jurisdiction under 28 U.S.C. §§ 157 and 1334(a), the District Court had jurisdiction under 28 U.S.C. § 158(a), and this Court has jurisdiction under 28 U.S.C. § 158(d)(1).
[6] On appeal, Disney "elected to discontinue [its] efforts to enforce [subsection 16(b)]."

not to sue relates only to *G-Force*; (2) the covenant not to sue does not grant a broad license; and (3) the sale of the patents was not subject to the covenant not to sue.

We conclude that the *G-Force* Agreement, including Section 16(a), is limited to the *G-Force* film.

Reading the *G-Force* Agreement in its entirety, as we must, *see State v. Continental Ins. Co.*, 281 P.3d 1000, 1004-05 (Cal. 2012), the contract is generally limited to the use of In Three's 3D patents in the *G-Force* film. At the outset, the *G-Force* Agreement clearly "set[s] forth the principal terms of the Agreement . . . with respect to [In Three's] services for the theatrical motion picture tentatively entitled 'G-Force.'" The *G-Force* Agreement provides specific instructions for delivery of the completed material for *G-Force*, "including a left eye and right eye digital 3D conversion of 17 minutes of [*G-Force*]," and formatting instructions specific to the *G-Force* film. Section 7(b) grants Disney "a perpetual, irrevocable, fully paid-up, royalty-free, worldwide right and license," but expressly in conjunction with "displaying, developing, enhancing, marketing, distributing or providing, maintaining, supporting, or otherwise using or exploiting [*G-Force*]." The integration clause in Section 19, captioned "Entire Understanding," reiterates that this "Agreement expresses the entire understanding between [Disney] and [In Three] with respect to [In Three's] services in connection with [*G-Force*]." Thus, key provisions in the contract limit the scope and use of the 3D patents to *G-Force*.

Although Section 16(a) does not expressly mention *G-Force*, its scope is limited to *G-Force* when read in conjunction with other provisions of the *G-Force* Agreement.

6

Section 16(b), for example, grants Disney the option to request a broad license to the 3D patents from In Three, but includes a detailed and multi-step negotiation process for doing so. Section 16(b) would have allowed Disney to do the work in-house, pursuant to an agreement between the parties. Similarly, Section 3(a), titled "Additional Services," allows Disney the option to use In Three on additional Disney projects for a period of five years when In Three has been offered an outside project, but that option, like Section 16(b), contains a formal mechanism by which Disney and In Three would have to separately negotiate and accept the terms of the additional Disney project. Thus, although Sections 3(a) and 16(b) of the *G-Force* Agreement provide options for additional work and a broader license, the inclusion of a formal negotiating process and the requirement of separate approvals for any additional projects suggests that the *G-Force* Agreement, including Section 16(a), is limited to the *G-Force* film absent further action and agreement.

Turning to patent law, Disney argues that DDMG and RealD acquired the 3D patent rights subject to the preexisting rights in Section 16(a). Specifically, Disney contends, "[a]s a matter of well-established patent law, pre-existing licenses are binding upon successors in interest and subsequent exclusive licensees." *See, e.g.*, *U.S. Philips Corp. v. Int'l Trade Comm'n*, 424 F.3d 1179, 1189 (Fed. Cir. 2005) ("A nonexclusive patent license is simply a promise not to sue for infringement."). Disney's argument assumes that the *G-Force* Agreement provides Disney with a broad license to the 3D patents beyond work on *G-Force*. Disney, however, did not exercise the option for an expansive license in Section 16(b) and, for the same reasons discussed above with respect

7

to the narrow covenant in Section 16(a), Disney's rights to the 3D patents are limited to *G-Force*. We agree with the District Court that, "[h]aving never exercised the option under the Agreement, Disney may not now claim that it has rights to the patents at issue that have survived the sale of such to RealD." Thus, to the extent there was a license to the 3D patents, it was limited to the work performed on *G-Force* and there was no patent right beyond *G-Force* to transfer.

In addition, Disney contends that Sections 16(d) and 19 of the *G-Force* Agreement confirm that In Three granted the covenant not to sue with the intention to bind subsequent owners. Section 16(d) provides that Section 16 "shall survive the expiration or termination of this Agreement." Section 19 provides "[t]he provisions hereof shall be binding upon the Company and the Company's heirs, executors, administrators, successors, and assigns." Yet under Section 10 of the *G-Force* Agreement, In Three did not have the right to assign the limited license: "This Agreement and Company's rights and obligations hereunder may not be assigned by Company." Disney, not In Three, had the right to assign the Agreement. Therefore, Section 19 is inapplicable to DDMG and RealD as neither was a party to the *G-Force* Agreement, neither has contractual privity with Disney, and neither could have served as an assignee under Section 10. Moreover, the Bankruptcy Court determined that RealD, the successful bidder, is not a successor to the debtor.

Finally, at oral argument on September 9, 2014, Disney asserted that the Bankruptcy Court should not have reached the issue of the scope of Section 16(a). This is a new argument, inconsistent with Disney's position at the bankruptcy hearing and on

8

appeal. Disney advocated for a particular interpretation of Section 16(a) in its objections to the Bankruptcy Court's letter ruling and at the second bankruptcy hearing. In its opening brief, it argued that Section 16(a) should be given effect beyond work on *G-Force*. It continued to press its argument in its reply brief. We find that Disney presented the issue for adjudication to the Bankruptcy Court and on appeal. It cannot now argue that we should remand the case for further hearings if we find that Section 16(a) is ambiguous.

## IV. Conclusion

For the foregoing reasons, we will affirm the judgment of the District Court.