Filed 9/16/16  Western Water Co. v. Yuba County Water Agency CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| WESTERN WATER COMPANY, | |
| Plaintiff and Appellant, | C072058 |
| v. | (Super. Ct. No. 34201000070834CUBCGDS) |
| YUBA COUNTY WATER AGENCY, | |
| Defendant and Respondent. | |

In 1991, the predecessor of Western Water Company entered into an agreement with Yuba County Water Agency (the Agency) granting an easement for the use and transportation of water in an area called the Goldfields.[1]  Western Water Company

---

[1] Western Aggregates LLC was a third party to the agreement and was joined in this litigation, but it took no position on the disputed issues at trial and it is not a party in this

1

(Western Water) subsequently filed suit alleging the Agency breached the agreement by taking subsurface water without paying for it, resulting in more than $100 million in damages.

The trial court heard extensive evidence, determined the agreement was ambiguous, ultimately found no breach of the agreement, and entered judgment in favor of the Agency. The trial court subsequently entered a supplemental judgment ordering Western Water to pay the Agency's attorney's fees.

Western Water now contends (1) section 9 of the agreement unambiguously granted the Agency a right to surface water, but the excess water at issue was subsurface water the Agency had no right to take without payment; (2) trial evidence proved the Agency breached the covenant of good faith and fair dealing by concealing and misrepresenting what it knew about the subsurface water flow; and (3) the supplemental judgment awarding attorney's fees should not have included $112,777.40 to a law firm the trial court had disqualified.

We conclude (1) the agreement does not require the Agency to pay groundwater prices for the excess water flowing naturally below the surface; (2) the Agency had no obligation to reveal everything it might have known about the quantity of the subsurface flow; and (3) the law firm at issue billed only for activities permitted by trial court order, and the trial court did not abuse its discretion in awarding attorney's fees.

We will affirm the judgment.

BACKGROUND

The Yuba River flows generally in a westerly direction out of the Sierra Nevada Range and across Yuba County. Before the mid- to late-1800's, the river flowed through

---

appeal. In a separate appeal, we recently affirmed an order for Western Water Company to pay attorney's fees to Western Aggregates LLC. (Western Water Company v. Western Aggregates LLC (Oct. 30, 2014, C071359) [nonpub. opn.].)

a flood plain several miles wide with multiple channels, but California's Gold Rush dramatically changed the topography. Dredged materials from the river's upper watershed were displaced by hydraulic gold mining and moved downstream, slowing and depositing in the flood plain. In the early 1900's, additional dredging operations separated the deposited materials as they searched for more gold. Western Water's predecessors and other dredge operators created large pits which filled with water, creating a series of ponds. Most of the Goldfield ponds are lower than the river and are separated from it by piles of dredge tailings.

Agricultural water districts eventually created a waterway called the South Canal to move water accumulating in the Goldfield ponds to farms in South Yuba County. A Water Delivery System was built in 1985 to directly divert water from the Yuba River along the edge of the Goldfields into the South Canal.

In May 1991, the Agency entered into an agreement with Western Aggregates and YG Development Company, which was formerly a part of Yuba Natural Resources and ultimately became Western Water. Because any distinctions between Western Water and its predecessors are not relevant to this case, further references to Western Water or its predecessors will be to Western Water. The stated purpose of the 1991 agreement was to (1) permit the Agency to use the Water Delivery System in perpetuity for delivery of water within its boundaries; (2) permit the Agency to develop and use surface water in perpetuity within its boundaries; (3) permit the Agency to develop and use up to 10,000 acre feet a year of groundwater; (4) provide Western Water with unlimited use of water for its operations; and (5) within five years, reach a Water Accord to develop groundwater sources and sell them outside the Agency's boundaries for maximum economic return to all parties. The Agency agreed to fund an exploration program to assess the quality and quantity of Goldfields groundwater and to consult with the other parties about the anticipated Water Accord.

3

Section 9 of the agreement defined the Agency's right to surface water, saying it had the exclusive right to develop, produce, transport, deliver and use "Goldfields Surface Water that enters the Water Delivery System by gravity flow or that can be pumped, diverted, or otherwise introduced into the Water Delivery System from ponds." Section 10 of the agreement gave the Agency a limited right to produce groundwater. Pursuant to section 21 of the agreement, the Agency paid $555,000 for the Water Delivery System easement and agreed to pay a quarterly "wheeling" fee of 25 cents per acre foot for water, other than Goldfields groundwater, transported through the Water Delivery System. The wheeling fee was determined based on measurements taken by Western Water at the south end of the Water Delivery System.

Section 21 also set the price the Agency would pay for groundwater. Until the Water Accord was complete, the Agency was limited to removing 10,000 acre feet per year of groundwater. Section 21(d) of the agreement required an annual payment of $3 per acre foot for groundwater the Agency "pumped" and "delivered" within its boundaries, or a payment of 50 percent of the net proceeds for each acre foot of Goldfields groundwater "pumped" for agricultural use by the Agency that year, up to 10,000 acre feet, not to exceed the number of acre feet of water sold outside the Agency's boundaries that year.

Other than as part of the exploration effort, the Agency agreed not to extract groundwater from aquifers below the Goldfields without the consent of the other parties. The Agency drilled some test wells but then abandoned the groundwater development project.

Western Water's second amended complaint (the complaint) alleged that each year, the Agency added approximately 30,000 acre feet of Yuba River water into the Water Delivery System but withdrew approximately 90,000 acre feet of water from the South Canal. According to the complaint, the 60,000 acre-foot difference was groundwater from the Goldfields that flowed into the Water Delivery System. The trial

4

court referred to this 60,000 acre-foot difference, which forms the subject of the instant dispute, as the "excess water." The complaint alleged the amount paid by the Agency for the excess water "was far less than the amounts that should have been paid, in accordance with the [agreement], for groundwater developed from the Goldfields." In other words, it appears the Agency had been paying the 25-cents-per-acre-foot wheeling fee for the excess water but Western Water alleged the Agency should have been paying the groundwater price of $3 per acre foot.

The complaint further alleged that when the agreement was being negotiated, the Agency knew there was excess water flowing naturally into the Water Delivery System but did not disclose that information, allowing Western Water to believe the only way groundwater could enter the system would be from mechanical pumping.

The trial court declared the agreement ambiguous and concluded from extrinsic evidence presented at trial that the parties intended the term "groundwater" to apply only to water pumped by mechanical means from below the Goldfields and not to the flow of water moving naturally below the surface. The trial court determined Western Water did not prove breach of the agreement or any right to equitable relief. It awarded attorney's fees to the Agency.

STANDARD OF REVIEW

We review the interpretation of an agreement de novo, except that when a trial court has considered conflicting extrinsic evidence to interpret an ambiguous term, we review the resolution of the factual conflicts for substantial evidence. (*Alameda County Flood Control & Water Conservation Dist. v. Department of Water Resources* (2013) 213 Cal.App.4th 1163, 1180.) "The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." (Civ. Code, § 1641.) The goal of contract interpretation is to give effect to the parties' mutual intent and their intent is to be inferred from the written provisions, if possible. (*State v. Continental Ins. Co*. (2012) 55 Cal.4th 186, 195.) A clear and explicit

5

contract term governs, but when it is capable of two or more reasonable constructions, the court must resolve the ambiguity. (*Ibid.*) A term is not ambiguous merely because it is left undefined or because the parties disagree about its meaning. (*Ibid.*)

We review the award of attorney fees for abuse of discretion. (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095.)

DISCUSSION

I

Western Water argues section 9 of the agreement unambiguously granted the Agency a right to Goldfields "surface" water entering the Water Delivery System, but the excess water at issue was "subsurface" water the Agency had no right to take without payment.

Section 9 provided: "9. <u>Agency's Right to Use Goldfields Surface Water</u>. Subject to the limitations set forth in section 12, the Agency shall have the exclusive right at its own expense to develop, produce, transport, deliver and use within its boundaries any Goldfields Surface Water that enters the Water Delivery System by gravity flow or that can be pumped, diverted or otherwise introduced into the Water Delivery System from ponds on the Goldfields. The Agency shall not sell or use any Goldfields Surface Water for any purpose other than delivery within its boundaries."

When we interpret an agreement, we do not simply focus on isolated words or phrases. (*Citizens for Goleta Valley v. HT Santa Barbara* (2004) 117 Cal.App.4th 1073, 1077.) We look to the contract as a whole. (Civ. Code, § 1641.) Section 1(e) of the agreement defined "Goldfields Surface Water" as "all water in the ponds on the Goldfields or otherwise on the surface of the Goldfields, other than water diverted, conveyed or pumped onto the surface of the Goldfields from a source outside the Goldfields." Section 1(f) defined "Goldfields Groundwater" as "all water underlying the Goldfields that can be pumped from under the Goldfields by wells, pumps or other

6

facilities located on the Goldfields." And section 21 required the Agency to pay for groundwater "pumped" and "delivered."

Western Water characterizes the excess water as "subsurface" water in its appellant's opening brief. It admits there is no specific reference in the agreement to the naturally occurring subsurface flow at issue, but it argues the absence of any such reference meant the Agency had no right to the subsurface flow without paying for it. Western Water's complaint alleged, however, that the amount paid by the Agency for the excess water "was far less than the amounts that should have been paid, in accordance with the [agreement], for groundwater developed from the Goldfields." Thus, Western Water appeared to allege in the complaint that although the Agency had been paying the 25-cents-per-acre-foot wheeling fee for the excess water, it should have been paying the groundwater price of $3 per acre foot.

Even if the subsurface water fit within the agreement's definition of groundwater, as Western Water urged in oral argument, the plain language of section 21 indicates the groundwater prices only applied to "pumped" groundwater. Here, the excess water was not pumped from under the Goldfields, it entered the Water Delivery System naturally by gravity flow. This interpretation is clear even without resort to extrinsic evidence. The agreement does not require the Agency to pay groundwater prices for the excess water.

Although our determination is made without resort to extrinsic evidence, it is nevertheless reaffirmed by substantial extrinsic evidence in the record. The lawyer who negotiated the agreement for the Agency testified that Western Water proposed the language distinguishing pumped water and water flowing by gravity. The Agency's lawyer believed the proposed language was consistent with his own proposal. In addition, Western Water's president negotiated the agreement for his company. He knew water would flow through disturbed gravel but his focus was on deeper water located under a clay lens beneath the dredged material that would need to be pumped from wells.

7

Western Water claims the trial court was wrong in concluding that references in the agreement to surface water are not connected with pumping. It notes that section 9 expressly refers to Goldfields surface water pumped into the Water Delivery System. Western Water also argues the trial court was wrong when it associated surface water with the Yuba River, arguing it makes no difference if water came from the Yuba River. Even if those points are true, the record supports our conclusion that the agreement does not require the Agency to pay groundwater prices for the excess water.

Additionally, Western Water argues the trial court improperly rewrote the agreement to give the Agency a benefit it was denied during negotiations. But the Agency's proposed language about subsurface water was replaced by Western Water's language requiring the Agency to pay only for water "pumped" and "delivered." The trial court did not rewrite the agreement.

## II

Western Water next contends trial evidence proved the Agency breached the covenant of good faith and fair dealing by concealing and misrepresenting what it knew about the subsurface water flow.

Section 18 of the agreement provides: "Each party shall exercise the highest standard of good faith, fair dealing and full disclosure toward each of the other Parties with respect to all matters under this Agreement." Western Water claims there is only one plausible explanation that the agreement failed to refer to naturally flowing subsurface water of such volume and value: Western Water was not aware there was such a significant subsurface flow, and the Agency did not call attention to the issue. Western Water asserts there were Agency employees who took regular measurements and the negotiators should have discovered and disclosed the information.

The trial court found, however, that "[b]oth parties knew that substantial amounts of water moved through the disturbed gravel areas of the Goldfields as subsurface flow, even if they did not know the exact quantity of such flow. Having such knowledge, they

8

freely agreed that such subsurface flow was not to come within the contractual definition of groundwater." Substantial evidence supports the trial court's findings. In addition, the trial court found no evidence that the Agency engaged in misrepresentation or concealment. Western Water's lawyer had little recollection of the negotiation but said he had no indication the Agency concealed information.

Western Water's contentions regarding breach of the covenant of good faith and fair dealing lack merit.

III

In addition, Western Water argues the supplemental judgment awarding attorney's fees should not have included $112,777.40 to a law firm the trial court had disqualified. It cites *A.I. Credit Corp., Inc. v. Aguilar & Sebastinelli* (2003) 113 Cal.App.4th 1072, for the proposition that an attorney disqualified for violating an ethical obligation is not entitled to fees. (*Id*. at p. 1079.) But that case is inapposite because it involved a client's obligation to pay its own lawyer after the lawyer breached the duty of loyalty to the client. (*Id*. at p. 1080.)

Here, the trial court granted Western Water's motion to disqualify the law firm Bartkiewicz, Kronick & Shanahan, ordering the firm not to consult, advise or communicate with the Agency because it previously obtained confidential information from Western Water's expert. But because the Bartkiewicz firm was not the Agency's trial counsel and the Agency's trial counsel was already privy to the confidential information, the trial court did not preclude the Bartkiewicz firm from consulting, advising or communicating with the Agency's trial counsel. Later, in its order for attorney's fees, the trial court said it reviewed the billing records of the Bartkiewicz firm and found that all of the activities fell within the scope of activities authorized by the prior order.

Western Water has not established that the trial court abused its discretion in ordering the attorney's fees.

9

## DISPOSITION

The judgment is affirmed.

_____/S/_____
MAURO, J.

We concur:

_____/S/_____
RAYE, P. J.

_____/S/_____
BLEASE, J.